PEYTON, PENITENTIARY SUPERINTENDENT *v.*
ROWE ET AL.

No. 802. Argued March 27, 1968.—Decided May 20, 1968.

*Reno S. Harp III,* Assistant Attorney General of Virginia, argued the cause for petitioner. With him on the briefs was *Robert Y. Button,* Attorney General.

*John J. Kirby, Jr.,* argued the cause for respondents, *pro hac vice.* With him on the brief was *Thomas S. Currier.*

*Thomas C. Lynch,* Attorney General, and *Edward P. O'Brien, Derald E. Granberg,* and *Clifford K. Thompson, Jr.,* Deputy Attorneys General, filed a brief for the State of California, as *amicus curiae,* urging reversal.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This case concerns the scope of 28 U. S. C. § 2241 (c)(3), which specifies that the United States District Courts may issue writs of habeas corpus on behalf of prisoners who are "in custody in violation of the Constitution . . . of the United States." The question presented is whether a district court may entertain a petition for a writ of habeas corpus from a prisoner incarcerated under consecutive sentences who claims that a sentence that he is scheduled to serve in the future is invalid because of a deprivation of rights guaranteed by the Constitution. The Court considered this issue in *McNally* v. *Hill,* 293 U. S. 131 (1934), and held that the habeas corpus statute does not authorize attacks upon future consecutive sentences. We granted certiorari in this case to re-examine *McNally.* 389 U. S. 1035 (1968). We conclude that the decision in that case was compelled neither by statute nor by history and that today it represents an indefensible barrier to prompt adjudication of constitutional claims in the federal courts.

Respondents, Robert Rowe and Clyde Thacker, are serving prison terms in the Virginia State Penitentiary. In June 1963 Rowe was sentenced to 30 years' imprisonment after a jury found him guilty of rape. Subsequently, he pleaded guilty to an indictment charging him with felonious abduction with intent to defile arising from the same events which had led to the rape conviction.[1] He

---

[1] Rowe's initial plea of double jeopardy had been overruled by the trial court.

was sentenced to a 20-year term on this conviction to run consecutively to the 30-year sentence. After exhausting state remedies,[2] Rowe petitioned for a writ of habeas corpus in the United States District Court for the Western District of Virginia. He did not attack the rape conviction, but alleged that the conviction for felonious abduction was constitutionally defective because he had been subjected to double jeopardy, because his plea of guilty had been involuntary, because the indictment had failed to state an offense and because he had been inadequately represented by trial counsel. Without reaching the merits of Rowe's claims, the District Court denied relief. Applying *McNally*, the court found Rowe was then detained under the 30-year sentence for rape. Since he did not claim that sentence was invalid, it was held that he was not then "in custody" under an unconstitutionally imposed sentence within the meaning of § 2241. The court concluded that it could not entertain Rowe's challenge to the conviction for felonious abduction until he was confined under the sentence imposed for that conviction. That time would not arrive until 1993.[3]

Thacker's § 2241 petition in the Eastern District of Virginia met a similar fate. He is imprisoned under a number of sentences totaling more than 60 years. He asserted that three consecutive five-year sentences imposed for housebreaking in 1953 were invalid because of

---

[2] Rowe had filed an application for state habeas corpus relief in the Virginia Supreme Court of Appeals. This petition was denied under Virginia's version of the *McNally* rule. See *Peyton v. Williams*, 206 Va. 595, 145 S. E. 2d 147 (1965). Subsequent to the decision below, the Virginia Legislature enacted a statute, effective June 28, 1968, which will abolish the rule of prematurity in the State. See n. 17, *infra*.

[3] If Rowe receives full credit for "good time," the 30-year sentence will expire in 1982. Under the two sentences, he will be eligible for parole in 1974. If he were relieved of the 20-year term, he would be eligible for parole in 1970. See Va. Code Ann. § 53–251 (1967).

inadequate representation by counsel at the time he entered pleas of guilty.[4] Finding that Thacker's attack on these sentences was premature because he had not begun to serve them, the District Court dismissed the petition "without prejudice to Thacker's reapplication at the proper time." Under *McNally*, the "proper time" will be in 1994 when Thacker commences service of the first of the three sentences he challenges.[5]

The Court of Appeals for the Fourth Circuit consolidated the two cases. After a hearing *en banc*, it reversed and remanded them to the District Courts. 383 F. 2d 709 (1967). Recognizing that the District Courts had correctly applied *McNally*, the Court of Appeals declined to adhere to that decision. Writing for a unanimous court, Chief Judge Haynsworth reasoned that this Court would no longer follow *McNally*, which in his view represented a "doctrinaire approach" based on an "old jurisdictional concept" which had been "thoroughly rejected by the Supreme Court in recent cases."[6] *Id.*,

---

[4] These sentences were originally suspended, but the suspension was revoked in 1956.

[5] If Thacker does not receive good-time credit, he will commence service of the three sentences in 2009. He will be eligible for parole in 1976.

[6] The decision of the Court of Appeals in the present case was preceded by two cases in which it held that § 2241 (c)(3) permits attack upon a future consecutive sentence which affects or may affect a prisoner's current parole eligibility. *Williams* v. *Peyton*, 372 F. 2d 216 (C. A. 4th Cir. 1967); *Martin* v. *Virginia*, 349 F. 2d 781 (C. A. 4th Cir. 1965). In *McNally*, the Court rejected the prisoner's argument that he was entitled to habeas corpus relief because he would be eligible for parole if the challenged sentence were invalidated. 293 U. S., at 134, 140. In *Williams* and *Martin*, the Court of Appeals concluded that this Court's decision in *Jones* v. *Cunningham*, 371 U. S. 236 (1963), represented a departure from this narrow reading of the habeas corpus statute.

at 714. We are in complete agreement with this conclusion and the considerations underlying it.

The writ of habeas corpus is a procedural device for subjecting executive,[7] judicial,[8] or private [9] restraints on liberty to judicial scrutiny. Where it is available, it assures among other things that a prisoner may require his jailer to justify the detention under the law.[10] In England where it originated and in the United States, this high purpose has made the writ both the symbol and guardian of individual liberty. 3 Blackstone, Commentaries *131–138; see *Ex parte Bollman,* 4 Cranch 75 (1807); *Ex parte Lange,* 18 Wall. 163 (1874); *Moore* v. *Dempsey,* 261 U. S. 86 (1923); *Johnson* v. *Zerbst,* 304 U. S. 458 (1938); *Brown* v. *Allen,* 344 U. S. 443 (1953); *Fay* v. *Noia,* 372 U. S. 391 (1963).

The habeas corpus jurisdiction of the federal courts is enumerated in 28 U. S. C. § 2241. Like the predecessor statute which controlled in *McNally,*[11] § 2241 provides for

---

[7] *E. g., Darnel's Case* ["Five Knights' Case"] 3 How. St. Tr. 1–59 (K. B. 1627); *Ex parte Milligan,* 4 Wall. 2 (1866). The proceedings in *Darnel's Case* are summarized in D. Meador, Habeas Corpus and Magna Carta 13–16 (1966).

[8] *E. g., Bushel's Case,* Jones, T. 13, 84 Eng. Rep. 1123 (K. B.); *Walker* v. *Wainwright,* 390 U. S. 335 (1968).

[9] *E. g., Rex* v. *Clarkson,* 1 Strange 444, 93 Eng. Rep. 625 (K. B. 1721); see *Ford* v. *Ford,* 371 U. S. 187 (1962).

[10] The indignation aroused by the decision in *Darnel's Case, supra,* n. 7, led to enactment in 1627 of the Petition of Right, 3 Car. 1, c. 1, which condemned a return reciting that imprisonment was by "speciale mandatum Domini Regis" as insufficient under "the law of the land." See W. Church, A Treatise on the Writ of Habeas Corpus 8–9 (2d ed. 1893). In the United States, the Act of February 5, 1867, c. 28, 14 Stat. 385, made the writ available to "any person . . . restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States."

[11] Rev. Stat. § 753 (1874). For a collection and discussion of the federal habeas corpus statutes from the original Judiciary Act of 1789 to 1953, see G. Longsdorf, The Federal Habeas Corpus Acts Original and Amended, 13 F. R. D. 407 (1953).

the issuance of writs on behalf of persons "in custody." But the statute does not attempt to define the terms "habeas corpus" or "custody." Confronted with this fact, the Court in *McNally* reasoned that "[t]o ascertain its meaning and the appropriate use of the writ in the federal courts, recourse must be had to the common law . . . and to the decisions of this Court interpreting and applying the common law principles . . . ." *McNally* v. *Hill*, 293 U. S., at 136. We need not look very far to discover three principal characteristics of the writ as it had developed in the federal courts even before the decision in *McNally*. First, though the writ in England had been utilized largely to secure the admission to bail and discharge of prisoners,[12] its major office in the federal courts since the Civil War has been to provide post-conviction relief.[13] Second, the partial codifications of the common-law writ in England and more recent legislation in this country have contained specific and detailed provisions requiring *prompt* adjudication of the validity of the challenged restraint. See and compare Habeas Corpus Act of 1679, 31 Car. 2, c. 2; Act of February 5, 1867, c. 28, 14 Stat. 385; and 28 U. S. C. § 2243. Third, at least tentatively in *Frank* v. *Mangum*, 237 U. S. 309

---

[12] The celebrated Habeas Corpus Act of 1679, 31 Car. 2, c. 2, was concerned exclusively with providing an efficacious remedy for pretrial imprisonment. See W. Church, A Treatise on the Writ of Habeas Corpus 21–32, 48–58 (2d ed. 1893).

[13] This development is explained in part by this Court's recognition that certain trial or sentencing defects could invalidate the proceedings in a court which had jurisdiction over the crime and the defendant, *e. g.*, *Ex parte Lange*, 18 Wall. 163 (1874), by the Court's decisions holding that some of the safeguards of criminal procedure embodied in the Bill of Rights are applicable to state criminal proceedings by virtue of the Due Process Clause of the Fourteenth Amendment, and by the requirement that a state prisoner exhaust state remedies before applying for federal habeas corpus. *Ex parte Royall*, 117 U. S. 241 (1886); 28 U. S. C. § 2254; see *Fay* v. *Noia*, 372 U. S. 391, 415–420 (1963).

(1915), and more clearly in *Moore* v. *Dempsey,* 261 U. S. 86 (1923), this Court had recognized that a district court was authorized to look behind the bare record of a trial proceeding and conduct a factual hearing to determine the merits of alleged deprivations of constitutional rights [14]—a procedure that reached full flowering in *Johnson* v. *Zerbst,* 304 U. S. 458 (1938). Thus, by the time *McNally* was decided, the federal writ of habeas corpus was substantially a post-conviction device which could afford prompt adjudication of factual as well as legal issues. Keeping these purposes of the writ in mind, we turn to consideration of the *McNally* holding and the reasons which compel us to overrule it.

A federal jury had found McNally guilty of three counts of an indictment charging offenses under the Motor Vehicle Theft Act (now 18 U. S. C. §§ 2312–2313).[15] He had been sentenced to two years on the first count and four years each on the second and third counts, the sentences on the first and second counts to run con-

---

[14] The Court in *Frank* recognized that the Act of February 5, 1867, c. 28, 14 Stat. 385, substituted "for the bare legal review that seems to have been the limit of judicial authority under the common-law practice . . . a more searching investigation, in which the applicant is put upon his oath to set forth the truth of the matter respecting the causes of his detention, and the court, upon determining the actual facts, is to 'dispose of the party as law and justice require.'" 237 U. S., at 330–331. In *Moore,* the Court remanded the case to the District Court for determination of the truth of allegations that the pervading influence of a mob had denied the appellants a fair trial in the state court. 261 U. S., at 92.

[15] Because McNally was imprisoned by federal authorities, his application for habeas corpus relief could have rested on the clause of Rev. Stat. § 753 (1874) which authorized federal courts to entertain petitions from prisoners in the custody of the United States. However, the Court's interpretation of the custody requirement in *McNally* was equally applicable to state prisoners claiming their incarceration violated the Constitution. *E. g., Darr* v. *Burford,* 339 U. S. 200, 203 (1950).

currently and the sentence on the third consecutively. In his application in a district court for a writ of habeas corpus, McNally claimed that the indictment failed to state an offense as to the third count. He did not attack the convictions under the first and second counts. When he filed his petition he was serving under the second count. The lower courts denied relief on the merits. But this Court affirmed on a jurisdictional ground, holding that because McNally had not begun to serve the sentence on the third count—and therefore was not "in custody" under that sentence—his petition for relief was premature:

> "[W]ithout restraint which is unlawful, the writ may not be used. A sentence which the prisoner has not begun to serve cannot be the cause of restraint which the statute makes the subject of inquiry." 293 U. S., at 138.

The effect of this disposition was ameliorated somewhat by the Court's suggestion that McNally might seek relief by another route. *Id.*, at 140. See also *Holiday v. Johnston,* 313 U. S. 342, 349 (1941). But cf. *Ex parte Hull,* 312 U. S. 546 (1941). Moreover, McNally's challenge was directed at the face of the indictment. Therefore, postponement of adjudication of his claims probably would not have resulted in the loss of crucial evidence. But the harshness of a rule which may delay determination of federal claims for decades becomes obvious when applied to the cases of Rowe and Thacker. Their cases also exemplify the manner in which the decision in *McNally* cuts against the prior and subsequent development of the writ in the federal courts.

Both Rowe and Thacker allege that they were so inadequately represented at trial that they were denied the assistance of counsel in violation of the Sixth and Fourteenth Amendments. Petitioner concedes that, but for

*McNally,* respondents' allegations would entitle them to plenary hearings in the District Courts. Brief for Petitioner 6. Yet, under the current schedules of confinement, it is argued, neither Rowe nor Thacker may obtain adjudication of his claims until after 1990. By that time, dimmed memories or the death of witnesses is bound to render it difficult or impossible to secure crucial testimony on disputed issues of fact. Of course prejudice to meritorious claims resulting from the kind of delay which *McNally* imposes is not limited to situations involving ineffective assistance of counsel. To name but a few examples, factual determinations are often dispositive of claims of coerced confession, *e. g., Reck* v. *Pate,* 367 U. S. 433 (1961), *Leyra* v. *Denno,* 347 U. S. 556 (1954); lack of competency to stand trial, *e. g., Pate* v. *Robinson,* 383 U. S. 375 (1966); and denial of a fair trial, *e. g., Sheppard* v. *Maxwell,* 384 U. S. 333 (1966). Postponement of the adjudication of such issues for years can harm both the prisoner and the State and lessens the probability that final disposition of the case will do substantial justice.[16] As the Court of Appeals observed:

> "Years hence, the prisoner, at least, may be expected to give testimonial support to the allegations of his petition, but if they are false in fact, the Commonwealth of Virginia may be unable to refute them because of the unavailability of records and of the testimony of responsible officials and participants in the trial. The greater the lapse of time, the more unlikely it becomes that the state could reprosecute if retrials are held to be necessary. It

[16] Even where resolution of constitutional claims turns on record evidence, loss or destruction of a relevant document or failure to transcribe the record over a period of years, cf. *Norvell* v. *Illinois,* 373 U. S. 420 (1963), could mean that a claim relegated to the limbo of prematurity might never be adequately determined.

is to the great interest of the Commonwealth and to the prisoner to have these matters determined as soon as possible when there is the greatest likelihood the truth of the matter may be established." [17] 383 F. 2d, at 715.

Clearly, to the extent that the rule of *McNally* postpones plenary consideration of issues by the district courts, it undermines the character of the writ of habeas corpus as the instrument for resolving fact issues not adequately developed in the original proceedings. To that extent, it also undermines *Moore* v. *Dempsey, supra,* and is inconsistent with subsequent decisions of this Court which have reaffirmed *Moore.* *E. g., Johnson* v. *Zerbst,* 304 U. S. 458 (1938); *Brown* v. *Allen,* 344 U. S. 443 (1953); *Fay* v. *Noia,* 372 U. S. 391 (1963).

*McNally* is also at odds with the purpose of the writ of habeas corpus in another respect. As noted above, a principal aim of the writ is to provide for swift judicial review of alleged unlawful restraints on liberty. Calendar congestion, considerations of federalism, see, *e. g., Fay* v. *Noia,* 372 U. S., at 415–420; *Ex parte Royall,*

---

[17] This consideration has led at least two States which previously followed the prematurity doctrine to reject it in recent years. See *Commonwealth ex rel. Stevens* v. *Myers,* 419 Pa. 1, 213 A. 2d 613 (1965); Ore. Rev. Stat. § 138.510 (1961). See also *Landreth* v. *Gladden,* 213 Ore. 205, 324 P. 2d 475 (1958). California does not follow the *McNally* rule. *In re Chapman,* 43 Cal. 2d 385, 273 P. 2d 817 (1954). Finally, while this case was under consideration in this Court, Virginia repudiated the prematurity doctrine by statute. See Va. S. No. 44, 1968 Sess., amending Va. Code Ann. § 8–596 (effective June 28, 1968). A committee of the American Bar Association which is inquiring into post-conviction remedies has recommended abandonment of the prematurity doctrine which it calls "one of the most frustrating elements of present post-conviction practice." Advisory Committee on Sentencing and Review, A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Post-Conviction Remedies 43 (Tent. Draft 1967).

64

 

117 U. S. 241 (1886), and the exigencies of appellate review account for largely unavoidable delays in the processing of criminal cases. But the prematurity rule of *McNally* in many instances extends without practical justification the time a prisoner entitled to release must remain in confinement. Rowe and Thacker eventually may establish that the convictions they challenge were obtained in violation of the Constitution. If they do, each day they are incarcerated under those convictions while their cases are in the courts will be time that they might properly have enjoyed as free men. Common sense dictates that prisoners seeking habeas corpus relief after exhausting state remedies should be able to do so at the earliest practicable time.

The foregoing analysis demonstrates that *McNally* is inconsistent with the purposes underlying the federal writ of habeas corpus. Moreover, in arriving at its decision, the Court in *McNally* relied in part upon an unnecessarily narrow interpretation of the habeas corpus statute. Standing alone, the limitation of § 2241 (c) (3)—that "[t]he writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution"—is not free of ambiguity. However, in common understanding "custody" comprehends respondents' status for the entire duration of their imprisonment. Practically speaking, Rowe is in custody for 50 years, or for the aggregate of his 30- and 20-year sentences. For purposes of parole eligibility, under Virginia law he is incarcerated for 50 years. Va. Code Ann. § 53-251 (1967); see n. 3, *supra*. Nothing on the face of § 2241 militates against an interpretation which views Rowe and Thacker as being "in custody" under the aggregate of the consecutive sentences imposed on them. Under that interpretation, they are "in custody in violation of the Constitution" if any consecutive sentence they are scheduled to serve was imposed as the result

of a deprivation of constitutional rights. This approach to the statute is consistent with the canon of construction that remedial statutes should be liberally construed. It also eliminates the inconsistencies between purpose and practice which flow from the *McNally* holding. Meaningful factual hearings on alleged constitutional deprivations can be conducted before memories and records grow stale, and at least one class of prisoners will have the opportunity to challenge defective convictions and obtain relief without having to spend unwarranted months or years in prison.

We find unpersuasive the arguments made in *McNally* to support the narrower interpretation of the custody requirement. No prior decision of the Court was cited as clear authority for the prematurity doctrine.[18] To fill the gap, the Court relied on the history of the writ in England prior to 1789 and a line of reasoning whose unexamined premise was doubtful before *McNally* and was subsequently rejected. Both the historical and conceptual bases of the opinion are revealed in the Court's observation that "[d]iligent search of the English authorities and the digests before 1789 has failed to disclose any case where the writ was sought or used . . . as a means of securing the judicial decision of any question which, even if determined in the prisoner's favor, could

---

[18] Of the prior decisions of this Court cited in *McNally*, only *In re Swan*, 150 U. S. 637 (1893), suggested a rule of prematurity. Even in *Swan*, the Court held no more than that the prisoner was not entitled to immediate discharge from confinement merely because the sentencing judge had imposed an allegedly unauthorized fine in addition to a valid prison term. 150 U. S., at 653. In at least two cases, *Morgan* v. *Devine*, 237 U. S. 632 (1915), and *Ex parte Spencer*, 228 U. S. 652 (1913), the Court had reached the merits of habeas corpus applications by prisoners who had not served the valid portions of their sentences. Though relief was ultimately denied in *Morgan* and *Spencer*, they illustrate that the prior decisions of the Court by no means compelled the *McNally* result.

not have resulted in his immediate release." *McNally* v. *Hill*, 293 U. S., at 137–138. To the extent that the Court thought that the absence of eighteenth century English precedent demonstrated that McNally was not entitled to habeas corpus relief, the Court's reliance seems to have been misplaced. In light of the fact that English judges had no power to impose cumulative punishment in felony cases,[19] and apparently did not assume such power in misdemeanor cases until 1769,[20] it is not at all surprising that research failed to uncover a pre-1789 common-law analogy for McNally's petition for relief. In any event, the development of the writ of habeas corpus did not end in 1789. What we said of the writ in a similar context in *Jones* v. *Cunningham*, 371 U. S. 236 (1963), is equally applicable here.

> "[The writ] is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty." *Id.*, at 243.

Of course the excursion in *McNally* into history to determine that the writ of habeas corpus issued only to adjudicate entitlement to "immediate release" was not unnecessary. Though *McNally* held only that the petitioner did not meet the custody requirements of the statute, see *Walker* v. *Wainwright*, 390 U. S. 335 (1968), that holding rested in part on the premise that physical discharge from custody is the only relief available in a habeas corpus proceeding. But the statute does not deny the federal courts power to fashion appropriate relief other than immediate release. Since 1874, the habeas

---

[19] See *Regina* v. *Albury*, [1951] 1 All E. R. 491 (Crim. App.); 1 J. Stephen, History of the Criminal Law of England 291–292 (1883).

[20] *Wilkes* v. *Rex*, 4 Bro. P. C. 360, 2 Eng. Rep. 244 (H. L. 1769).

corpus statute has directed the courts to determine the facts and dispose of the case summarily, "as law and justice require." Rev. Stat. § 761 (1874), superseded by 28 U. S. C. § 2243. Consistently with this command, this Court has held that a prisoner whose first-sentence parole was revoked upon a second conviction could challenge the second conviction in a habeas corpus proceeding though he would not be released if he prevailed, *Ex parte Hull*, 312 U. S. 546 (1941); that a person who was paroled after he filed his habeas corpus petition could still obtain relief from the restraints imposed by the parole conditions, *Jones* v. *Cunningham, supra;* and that a prisoner could attack the first of two consecutive sentences in a federal habeas corpus proceeding even though he would still be confined under the second sentence if he succeeded, *Walker* v. *Wainwright, supra.* See also *United States* v. *Pridgeon*, 153 U. S. 48, 63–64 (1894). Thus, to the extent that *McNally* relied on the notion that immediate physical release was the only remedy under the federal writ of habeas corpus, it finds no support in the statute and has been rejected by this Court in subsequent decisions.

We overrule *McNally* and hold that a prisoner serving consecutive sentences is "in custody" under any one of them for purposes of § 2241 (c)(3).[21] This interpretation is consistent with the statutory language and with the purpose of the writ of habeas corpus in the federal courts.

*Affirmed.*

---

[21] We intimate no views on the merits of respondents' underlying claims.