# Qualification Requirement for Aliens Under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996

The phrase "40 qualifying quarters of coverage" in title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 can fairly be interpreted as incorporating the methodology under section 213 of the Social Security Act for calculating quarters of coverage, but not also the strict definitions of wages, employment, and self-employment income under other sections of the Social Security Act.

March 27, 1997

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
SOCIAL SECURITY ADMINISTRATION

You have asked for the views of the Office of Legal Counsel on the meaning of the phrase "40 qualifying quarters of coverage" in title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104–193, 110 Stat. 2105, 2260 ("PRA" or "Act").[1] We understand that you have considered the issue and have concluded that the phrase "can fairly be interpreted as incorporating the methodology under section 213 of the Social Security Act for calculating quarters of coverage, but not also the strict definitions of wages, employment and self-employment income under other sections of the Social Security Act."[2] You have further indicated that the Department of Health and Human Services and the Department of Agriculture concur in your construction of the provision.[3] For the reasons set forth below, we also concur in your interpretation.

## BACKGROUND

### I. Personal Responsibility and Work Opportunity Reconciliation Act

Title IV of the PRA imposes a broad set of limitations on the availability of federal and state public benefits to aliens. Although the most categorical limitations apply to aliens who are not classified as "qualified alien[s]" for purposes

---

[1] See Letter for Randolph D. Moss, Deputy Assistant Attorney General, Office of Legal Counsel, from Arthur J. Fried, General Counsel, Social Security Administration (Nov 15, 1996)

[2] Id. at 1–2.

[3] When determining whether an agency's interpretation is entitled to judicial deference, the concurrence of other agencies may be relevant. See Nashville Gas Co. v Satty, 434 U S 136, 142 n.4 (1977) (agency interpretation may be entitled to more weight when consistent with interpretations of other agencies). In addition to the other agencies, Representative Bill Archer, Chairman, House Committee on Ways and Means, and Representative Clay Shaw, Chairman of the Ways and Means Subcommittee on Human Resources, have indicated that they also concur in your interpretation. We note, however, that the post-enactment views of members of Congress generally provide little guidance in statutory interpretation. See Weinberger v Rossi, 456 U S 25, 35 (1982), Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc, 447 U.S 102, 118 (1980)

of the Act, *see, e.g.*, PRA § 401, 110 Stat. at 2261, significant limitations apply even to those aliens generally deemed "qualified."[4] For purposes of this memorandum, three such limitations are significant. First, under section 402 of the Act, with certain exceptions, "qualified aliens" are precluded from receiving Food Stamps and Supplemental Security Income benefits, and, at the option of the state in which the alien resides, might also be denied Temporary Assistance for Needy Families, Social Security Block Grants, and Medicaid benefits. Second, under section 412 of the Act, again subject to defined exceptions, states are authorized to deny "any State public benefits" to "qualified aliens." Finally, under section 421 of the Act, in determining the eligibility for "any Federal means-tested public benefits program," an alien's income and resources are deemed to include the income and resources of his or her sponsor (and the sponsor's spouse).

Each of these three limitations on the availability of benefits, however, comes to an end once the "qualified alien:"

> *has worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act* or can be credited with such qualifying quarters as provided under section 435, and . . . in the case of any such qualifying quarter creditable for any period beginning after December 31, 1996, *did not receive any Federal means-tested public benefit* . . . during any such period.

PRA § 402(a)(2)(B)(ii), 110 Stat. at 2262–63 (emphasis added); PRA § 412(b)(2)(B)(i), 110 Stat. at 2269; PRA § 421(b)(2)(A), 110 Stat. at 2270.[5] Under section 435 of the Act, an alien is entitled to be credited with "qualifying quarters of coverage . . . worked by a parent . . . while the alien was under age 18" or by a spouse "during their marriage." PRA § 435(1) & (2), 110 Stat. at 2275.

---

[4] A "qualified alien" is "an alien who, at the time the alien applies for, receives, or attempts to receive a Federal public benefit is —

  (1) an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act,

  (2) an alien who is granted asylum under section 208 of such Act,

  (3) a refugee who is admitted to the United States under section 207 of such Act,

  (4) an alien who is paroled into the United States under section 212(d)(5) of such Act for a period of at least 1 year,

  (5) an alien whose deportation is being withheld under section 243(h) of such Act, or

  (6) an alien who is granted conditional entry pursuant to section 203(a)(7) of such Act as in effect prior to April 1, 1980 "

PRA § 431(b), 110 Stat at 2274. In addition, certain categories of aliens who (or whose children) have been subjected to battery or extreme cruelty in the United States by a family member with whom they reside are also "qualified aliens" for purposes of the PRA *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub L No 104–208, § 501, 110 Stat 3009–546, 3009–670.

[5] In addition, under sections 402 and 412, the "qualified alien" must be "lawfully admitted . . for permanent residence under the Immigration and Nationality Act." PRA § 402(a)(2)(B)(i), 110 Stat. at 2262, PRA § 412(b)(2)(A), 110 Stat. at 2269. No similar condition exists under section 421

## II. Social Security Act

Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401–433 (1994), defines the phrase "quarter of coverage" in section 213. For calendar years before 1978, with certain exceptions, the phrase means a period of three calendar months in which an individual has been paid $50 or more in "wages" or for which he or she has been credited with $100 or more in "self-employment income." 42 U.S.C. § 413(a). For the calendar year 1978, the amount of wages and self-employment income required for a quarter of coverage is $250. *Id.* § 413(d). Thereafter, the requisite amount is indexed to national average wages and published in the Federal Register on or before November 1 of each year. *Id.*

A separate section of title II defines the term "wages." In particular, section 209 defines "wages" to mean, in relevant part, "remuneration paid . . . for employment." 42 U.S.C. § 409(a). Section 409 provides numerous exemptions from the term "wages," including remuneration above certain dollar thresholds in specified calendar years, *id.* § 409(a)(1), and below certain dollars thresholds for specified employment, such as domestic service, *id.* § 409(a)(6)(B), agricultural labor, *id.* § 409(a)(7)(B), home worker service, *id.* § 409(a)(8), and service for a tax-exempt organization, *id.* § 409(a)(14)(A).

Still another section of title II defines the term "employment" to mean, in pertinent part, "any service of whatever nature, performed . . . by an employee for the person employing him." 42 U.S.C. § 410(a). Section 210 contains various exemptions from the term "employment," including service performed by certain federal government employees, *id.* § 410(a)(5) & (6), service performed by certain state and local governments employees, *id.* § 410(a)(7), and service performed by certain church ministers and other employees, *id.* § 410(8)(A) & (B).

## DISCUSSION

With this background in mind, we analyze the meaning of the phrase "has worked 40 qualifying quarters of coverage." Congress clearly provided that the phrase should be defined as "in title II of the Social Security Act." As described above, in defining the phrase "quarters of coverage," section 213 of the SSA describes the methodology for computing the amount of earnings that constitutes a quarter of coverage. In doing so, however, that provision uses the term "wages," which itself is defined elsewhere in title II of the SSA. The definition of the term "wages," in turn, uses the word "employment," which, similarly, is defined elsewhere in title II of the SSA. The definitions of both "wages" and "employment," moreover, contain limitations on the types of employment covered by the SSA (herein referred to as "covered employment limitations"). The question presented here is whether Congress intended to include these covered employment limitations in the PRA. Although a close question, we believe that

Congress did not and that the phrase "has worked 40 quarters of coverage as defined in title II of the Social Security Act" is best interpreted to adopt the SSA's mechanism for calculating the amount of wages necessary to obtain a quarter of coverage, but not the limitations on the types of employment in which the wages may be earned.

Although the most formalistic reading of the reference to title II of the SSA would incorporate all of its substantive provisions, including the cross-referenced covered employment limitations, it is not at all clear that this was what Congress intended. When confronting similarly complex statutory regimes that make use of cross-referenced definitional or comparable provisions, the courts of appeals have not mechanically incorporated the cross-referenced provisions on a wholesale basis. They instead have carefully considered the distinct statutory purposes and structures of the provisions at issue. For example, in *Skidgel v. Maine Dept. of Human Servs.*, 994 F.2d 930 (1st Cir. 1993), the Court of Appeals for the First Circuit refused to interpret a section of the SSA to include all the requirements of a cross-referenced provision of that statute. Section 602(a)(38) of the SSA governed the composition of a filing unit for purposes of receiving Aid to Families with Dependent Children. It provided that, in making the determinations of need with respect to a dependent child, states must include any parent of a dependent child and any sibling if such sibling "meets the conditions described in clauses (1) and (2) of section 606(a) . . . or in section 607(a)." 42 U.S.C. § 602(a)(38)(B) (1994). At issue was whether Congress intended to incorporate all of the descriptive terms in § 607(a), including a restrictive condition requiring a showing of need before the sibling may be included in the filing unit. The court rejected a rigid reading of the statutory language, observing that "[a] thorough analysis is especially warranted where, as here, we are charged with interpreting a complex and technical statute which has been amended over time and which contains elaborate, internal cross-references." *Skidgel*, 994 F.2d at 937. After carefully examining the family filing rule "in the context of its place in the statutory scheme and in light of its statutory purpose," *id.*, the court concluded that Congress did not intend the need requirement to apply. *Id.* at 938–39.

Similarly, in *Weingarden v. Commissioner*, 825 F.2d 1027 (6th Cir. 1987), the Court of Appeals for the Sixth Circuit declined to read a tax provision to include all the limitations of a cross-referenced section. Section 170(b)(1)(A) of the Internal Revenue Code permitted more generous charitable deductions for certain specified charitable organizations (such as churches, schools, and hospitals) and "an organization described in section 509(a)(2) or (3)." 26 U.S.C. § 170(b)(1)(A)(viii) (1994). The prefatory language contained in § 509(a) cross-referenced another tax provision, § 501(c)(3), that effectively would have limited the type of organizations that could qualify for more favorable tax treatment under § 170(b)(1)(A). 26 U.S.C. §§ 509(a), 501(c)(3) (1994). The court refused to interpret the ambiguous language of § 170(b)(1)(A) to incorporate this indirect limita-

tion, and instead followed the canon of construction that charitable donations should be construed liberally in favor of the taxpayer. *Weingarden*, 825 F.2d at 1029–30.

Likewise, in *United States v. National Marine Engineers' Beneficial Ass'n*, 294 F.2d 385 (2d Cir. 1961), the Court of Appeals for the Second Circuit, per Judge Friendly, refused to interpret a provision of the Labor Management Relations Act ("LMRA") to incorporate an exclusion in a cross-referenced statute. The LMRA defined the term "strike" to include "any concerted slowdown or other concerted interruption of operations by employees," 29 U.S.C. § 142(2) (1994), and defined "employee" to have "the same meaning as when used in [the National Labor Relations Act ("NLRA")]." *Id.* § 142(3). The NLRA, in turn, excluded supervisors from the definition of "employee." Thus, the question arose whether Congress intended to exclude supervisors from the definition of "strike" in the LMRA. Rejecting the claim that the court was required to read the statute to incorporate the cross-referenced limitation, Judge Friendly stated that "not only are we not required, we are not permitted to interpret statutes in the mechanical fashion for which appellants contend." *National Marine Engineers' Beneficial Ass'n*, 294 F.2d at 390–91. Rather, he stated, the court must look "to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning." *Id.* at 391. After comparing the history and purpose of the two labor statutes and their relationship to the supervisor exclusion, Judge Friendly concluded that Congress did not intend to exclude supervisors from the definition of "strike" in the LMRA.[6]

As in these cases, the path from the PRA to the covered employment limitations in the SSA is a circuitous one. The PRA makes no mention of any limitations on the types of employment covered by the exception, but refers only to the definition of "quarters of coverage" contained in the SSA. The SSA definition of "quarter of coverage," moreover, also makes no mention of the covered employment limitations, but simply uses the word "wages." It is not until we reach the definition of "wages" and the term "employment," which is used in defining "wages," that the covered employment limitations are introduced. In light of this circuitous path, it cannot be said that the PRA, on its face, plainly and unambiguously incorporates not only the mechanism for calculating "quarters of cov-

---

[6] In *Crilly v Southeastern Pa. Transp. Auth.*, 529 F 2d 1355 (3d Cir. 1976), the Court of Appeals for the Third Circuit adopted a similar approach, although it ultimately arrived at the same conclusion produced by a more formalistic reading of the provision in question There, the court construed the meaning of the term "employer" in the LMRA, which also was defined "as when used in [the NLRA] " 29 U S C. § 142(3) (1994). The cross-reference, the Court observed, "applied literally, suggests that political subdivisions of states are excluded from coverage under either act." *Crilly*, 529 F.2d at 1359. The court noted, however, that "several significant decisions have cautioned that literalism may not be [an] appropriate canon of    . construction" in the labor relations context Id Thus, it began the process of discerning congressional intent Finding no dispositive legislative history, the court "assess[ed] the precedential consequences of attributing to Congress one or the other intention." *Id* at 1361 Only after conducting this extensive analysis did the court conclude that Congress intended to exclude state and local government employees from the coverage of the LMRA *Id* at 1362–63.

erage,'' but also the covered employment limitations. Accordingly, we believe it is necessary to examine the "design and purpose" of the PRA to determine whether Congress intended to incorporate the covered employment limitations of the SSA. In our view, such an analysis demonstrates that Congress did not.

Looking first to the language of the PRA, we note a specific emphasis on "work," but not on a particular type of work. While the SSA focuses on whether the applicant has acquired "not less than" the requisite number of quarters of coverage, the PRA focuses on whether the applicant "has worked" for at least ten years. The choice of this particular language suggests, on the face of the statute, an emphasis on work, without restriction.

The legislative history of the PRA confirms this emphasis. It contains numerous references to the length of work required to qualify under the exception to the bar on public benefits in the PRA, but no reference to the type of work. With respect to the public benefits restriction in section 402, the Conference Report states that "excepted are legal permanent residents who *have worked* (in combination with their spouse and parents) *for at least 10 years.*" H.R. Conf. Rep. No. 104–725, at 380 (1996) (emphasis added). Similarly, with regard to section 412, the Conference Report simply provides that "[e]xceptions to State authority to deny benefits are made for . . . permanent resident aliens who *have worked* in the United States (in combination with their spouse or parents) *for at least 10 years.*" Id. at 384 (emphasis added). In connection with section 421, the Conference Report states that "[d]eeming extends until citizenship, unless the noncitizen *has worked for at least 10 years* in the United States (either individually or in combination with the noncitizen's spouse and parents)." *Id.* at 385 (emphasis added). Finally, the Conference Report describes the qualifying quarters provision in section 435 as follows:

> In determining whether an alien may qualify for benefits under the exception for individuals who *have worked at least 40 quarters* while in the United States . . . work performed by parents and spouses may be credited to aliens under certain circumstances. *Each quarter of work performed by the parent while an alien was under the age of 18 is credited to the alien,* provided the parent did not receive any Federal public benefits during the quarter. Similarly, *each quarter of work performed by a spouse of an alien during their marriage is credited to the alien,* if the spouse did not receive any Federal public benefits during the quarter.

*Id.* at 391–92 (emphasis added).

The focus in the PRA and *its* legislative history *on* whether the applicant has worked the requisite number of quarters — without regard to the type of work performed — is consistent with the PRA's express purpose, among other things,

to promote self-sufficiency among immigrants. In the PRA, Congress observed that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes. . . . It is a compelling government interest to enact new rules . . . in order to assure that aliens be self-reliant." PRA § 400, 110 Stat. at 2260.

Title IV rewards self-sufficiency by denying certain public benefits to aliens unless they "ha[ve] worked" for ten years. The covered employment limitations in the SSA, by contrast, serve a very different purpose that is unrelated to the principle of self-sufficiency. They were designed for a purpose unique to the insurance scheme established by the SSA — namely, to prevent the payment of social security benefits to those who, for a variety of reasons, have not paid into that system. Incorporating the covered employment limitations into the PRA would fail to reward long-standing work in an equitable fashion and thus would be inconsistent with the Act's purpose of promoting self-sufficiency among immigrants. We can conceive of no reason to reward most aliens who have worked for ten years, but not those who have worked for that period in certain government jobs or for churches, for example.[7] We do not believe Congress intended such a strange result.[8]

Finally, interpreting the PRA to include the covered employment limitations of the SSA would run counter to the canon of construction that remedial provisions should be construed liberally. *See Peyton v. Rowe*, 391 U.S. 54, 65 (1968); *see also Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994); *Jefferson County Pharm. Ass'n v. Abbott Lab.*, 460 U.S. 150, 159 (1983). Application of this canon of construction further supports our conclusion that Congress did not intend to restrict benefits only to those employees who could demonstrate 40 quar-

---

[7] In enacting title IV of the PRA, Congress also expressly intended that "the availability of public benefits not constitute an incentive for immigration to the United States" and found that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." PRA § 400, 110 Stat. at 2260 Construing the PRA to incorporate the covered employment limitations would not further this purpose The need to demonstrate ten years of work might well provide a disincentive to immigration for the purpose of receiving benefits. There is no reason to believe, however, that Congress concluded that a different (and more severe) limitation need apply to qualified aliens, who have spent all or a portion of their careers working in non-covered employment, in order to achieve the statutory purpose of removing a possible incentive to immigration

[8] It might be argued that Congress intended to include the covered employment limitations of the SSA to reduce the administrative burden of verifying quarters of coverage for PRA purposes. While administrators of PRA benefits may rely on the social security database in determining whether a "covered" alien had worked 40 qualifying quarters of coverage, they arguably have no such resource of "noncovered" aliens Although this may be true in some cases, it does not apply categorically Specifically, we understand that many covered employees have incomplete social security records, while many noncovered employees have complete records Incomplete (or no) documentation exists for covered employees whose employers have failed properly to report their income to the Social Security Administration. In addition, no computer data generally exist for any quarters of covered employment worked in the current year (so-called "lag earnings") Computer documentation does exist, however, for many noncovered employees dating as far back as 1978 In that year, due to a change in the law, many employers began reporting the annual earnings of all their employees, including noncovered employees The Social Security Administration has retained the raw data for these noncovered employees in its database. In any event, there is no evidence whatsoever that Congress intended to exclude classes of potential welfare recipients — such as those who had once worked for state government — to reduce the burden of verification To the contrary, § 432 recognizes the need to develop complicated verification procedures for the host of new criteria imposed by the Act, PRA § 432(a) & (b), 110 Stat. at 2274–75 (giving the Attorney General 18 months and states 24 months to comply)

ters of work in a particular type of employment.[9] Rather, to effectuate the remedial purpose of the 40 quarters exception, the Act extends benefits to all employees who have worked for at least ten years.

DAWN E. JOHNSEN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[9] We note that the Court of Appeals for the Sixth Circuit applied a similar analysis in determining whether Congress intended a provision of the tax code to incorporate all the limitations of a cross-referenced section. *See Weingarden,* 825 F 2d at 1029.