GRIFFITH, Circuit Judge,
concurring in the judgment in part and dissenting in part:
Nine detainees ask us to affirm district court orders requiring the government to provide thirty days’ notice of their transfers from Guantanamo Bay. I share the majority’s concern that requiring such notice limits the government’s flexibility in a sensitive matter of foreign policy. Nevertheless, in Boumediene v. Bush, —— U.S. -, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), the Supreme Court rejected this court’s view of the reach of the writ of habeas corpus and extended its protections to those held at Guantanamo Bay. Since at least the seventeenth century, the Great Writ has prohibited the transfer of prisoners to places beyond its reach where they would be subject to continued detention on behalf of the government. Because this protection applies to the petitioners, the critical question before us is what process a court must employ to assess the lawful *523 ness of their proposed transfers. Based on its reading of Munaf v. Geren, — U.S. -, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008), the majority finds sufficient the government’s representations that no transfer will result in continued detention on behalf of the United States. I write separately because I do not believe Munaf compels absolute deference to the government on this matter, and I believe the premise of Boumediene requires that the detainees have notice of their transfers and some opportunity to challenge the government’s assurances. Accordingly, I would affirm the district court orders.
I.
I agree with the majority that the district court has subject matter jurisdiction to hear the detainees’ challenges to their transfers. I am less certain than the majority, however, that there remains a statutory basis to hear these claims after Boumediene. The majority opinion in Boumediene said nothing about whether statutory habeas for the Guantanamo detainees survived the Military Commissions Act of 2006, Pub.L. No. 109-366, 120 Stat. 2600, and at least three Justices were of the view it did not. See Boumediene, 128 S.Ct. at 2278 (Souter, J., concurring, joined by Ginsburg & Breyer, JJ.) (noting that Congress “eliminated the statutory habeas jurisdiction over these claims, so that now there must be constitutionally based jurisdiction or none at all”). Statutory habeas may in fact exist for these detainees and cover claims against unlawful transfer, but for now this remains an open question, and the Constitution provides a more sure footing for jurisdiction.
The bar against transfer beyond the reach of habeas protections is a venerable element of the Great Writ and undoubtedly part of constitutional habeas. “[A]t the absolute minimum, the Suspension Clause protects the writ ‘as it existed in 1789.’ ” INS v. St. Cyr, 533 U.S. 289, 301, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996)). Because the Habeas Corpus Act of 1679 “was the model upon which the habeas statutes of the 13 American Colonies were based,” Boumediene, 128 S.Ct. at 2246; see Dallin H. Oaks, Habeas Corpus in the States, 1776-1865, 32 U. Chi. L.Rev. 243, 252 (1965) (explaining the “close conformity of most state legislation to the English Habe-as Corpus Act of 1679”), the Supreme Court has looked to the 1679 Act to determine the contours and content of constitutional habeas, see, e.g., Boumediene, 128 S.Ct. at 2245-47; Hamdi v. Rumsfeld, 542 U.S. 507, 557-58, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (Scalia, J., dissenting); Peyton v. Rowe, 391 U.S. 54, 58-59, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968). Section 12 of the 1679 Act included a prohibition against the transfer of prisoners to places where the writ did not run. See Habeas Corpus Act, 1679, 31 Car. 2, c. 2, § 12 (Eng.) (“[N]o subject ... may be sent ... into parts, garrisons, islands or places beyond the seas ... within or without the dominions of his Majesty ....”); see also Boumediene, 128 S.Ct. at 2304 (Scalia, J., dissenting) (“The possibility of evading judicial review through such spiriting-away was eliminated, not by expanding the writ abroad, but by forbidding (in Article XII of the Act) the shipment of prisoners to places where the writ did not run or where its execution would be difficult.”); Oaks at 253 (“The act also prohibited sending persons to foreign prisons (§ 12).”). Because Boumediene extended constitutional habe-as to the Guantanamo detainees, see 128 S.Ct. at 2240 (holding that petitioners “have the constitutional privilege of habeas corpus, a privilege not to be withdrawn except in conformance with the Suspension Clause”), we should acknowledge that ju *524 risdiction to hear the petitioners’ claims against unlawful transfer — a fundamental and historic habeas protection — is grounded in the Constitution.
II.
Transfer to continued detention on behalf of the United States in a place where the writ does not reach would be unlawful and may be enjoined. The question we must consider is what process courts must use to determine whether the government’s proposed transfers run afoul of that bar. The majority holds that the district court must defer to the Executive’s sworn representations that transfer to the physical custody of a foreign government will not involve continued detention on behalf of the United States. Majority Op. at 516. But this will leave the petitioners without any opportunity to challenge the accuracy of the government’s sworn declarations. Although prudential concerns may justify some flexibility in fashioning habeas relief, see Boumediene, 128 S.Ct. at 2267 (noting that “common-law habeas corpus was, above all, an adaptable remedy”), such innovations must not strip the writ of its essential protections. See id. at 2276 (“Certain accommodations can be made to reduce the burden habeas corpus proceedings will place on the military without im-permissibly diluting the protections of the writ.”).
Fundamental to a prisoner’s habeas rights is the government’s duty to appear in court to justify his detention. At its most basic level, habeas “protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account.” Id. at 2247; see Peyton, 391 U.S. at 58, 88 S.Ct. 1549 (“The writ of habeas corpus is a procedural device for subjecting executive, judicial, or private restraints on liberty to judicial scrutiny. Where it is available, it assures among other things that a prisoner may require his jailer to justify the detention under the law.”). To vindicate the detainees’ habeas rights, Boumediene requires the court to “conduct a meaningful review” of the government’s reasons for the detention, which includes, at the very least, the rudimentaries of an adversary proceeding. 128 S.Ct. at 2268-69 (for the “writ [to] be effective ... [t]he habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive’s power to detain,” typically through “a fair, adversary proceeding”); see also id. at 2269 (identifying as a critical deficiency in the CSRT process the “constraints upon the detainee’s ability to rebut the factual basis for the Government’s assertion that he is an enemy combatant”). Calling the jailer to account must include some opportunity for the prisoner to challenge the jailer’s account.
Here the nine detainees claim their transfers may result in continued detention on behalf of the United States in places where the writ does not extend, effectively denying them the habeas protections Boumediene declared are theirs. See, e.g., Appellees’ Supp. Br. at 4-5 (arguing that habeas “extends to ensuring that any proposed ‘release’ ” would not result in “continued unlawful detention in a location beyond the jurisdiction of the district court ... in coordination with[ ] or at the behest of the United States”); Appellees’ Supp. Resp. Br. at 5-6; Application for Prelim. Inj. at 7, 9-10, Kiyemba v. Bush, No. 05-1509 (D.D.C. Sept. 9, 2005). The stakes of unlawful custody, which led the Court in Boumediene to extend habeas protections to the detainees in the first place, are no higher than the stakes of unlawful transfer. Indeed, because an unlawful transfer will deny the detainees any prospect of judicial relief, protecting their habeas rights in this context is vital.
*525 It is significant that the government has submitted sworn declarations assuring the court that any transfer will result in release from U.S. authority. If the government’s representations are accurate, each transfer will be lawful, for in habeas the only relevant judicial inquiry about a transfer is whether it will result in continued detention on behalf of the United States in a place where the writ does not run. But as we recently noted in another case involving the scope of habeas protections for detainees at Guantanamo Bay, a “naked declaration cannot simply resolve the issue.” Al-Odah v. United States, 559 F.3d 539, slip op. at 10 (D.C.Cir.2009) (per curiam) (rejecting “the government’s suggestion that its mere certification — that the [classified] information redacted from the version of the [document] provided to a detainee’s counsel do[es] not support a determination that the detainee is not an enemy combatant — is sufficient to establish that the information is not material” (internal quotation marks omitted)); see id. at 545, slip op. at 11 (“[I]t is the [habeas] court’s responsibility to make the materiality determination itself.”). Critical to ensuring the accuracy of the government’s representations is an opportunity for the detainees to challenge their veracity. The rudimentaries of an adversary proceeding demand no less. See Boume-diene, 128 S.Ct. at 2273 (“If a detainee can present reasonably available evidence demonstrating there is no basis for his continued detention, he must have the opportunity to present this evidence to a habeas corpus court.”). When an individual entitled to habeas protections faces the prospect of continued detention — be it by the United States at Guantanamo Bay or on its behalf after transfer to a foreign nation — he must be afforded some opportunity to challenge the government’s case.
Relying solely on the government’s sworn declaration and despite the petitioners’ claims to the contrary, the majority insists that this case is not about possible continued detention by a foreign nation on behalf of the United States. Majority Op. at 515-16. But the majority makes too much of what the government has actually said. The government has stated only that transfer to a foreign nation will result in release of the detainees from the physical custody of the United States. See Declaration of Matthew C. Waxman, Deputy Assistant Sec’y of Def. for Detainee Affairs 2-3 (June 2, 2005). The declaration expressly left open the possibility that a foreign nation will continue detention of the petitioners. See id. at 2 (“[T]he United States also transfers GTMO detainees, under appropriate circumstances, to the control of other governments for continued detention.... ”). The possibility of continued detention by a foreign nation on behalf of the United States after a transfer is the very issue we must address. Although the status of these detainees has been put to an adversarial process, whether their transfers will be lawful has not. I do not see how the court can safeguard the habe-as rights Boumediene extended to these detainees without allowing them to challenge the government’s account.[1]
Munaf is not to the contrary. The majority makes much of its language that courts may not “second-guess” the govern- *526 merit’s determinations, but it overlooks a significant difference between that case and ours: the Munaf petitioners knew in advance that the government intended to transfer them to Iraqi authorities and had the opportunity to demonstrate that such a transfer would be unlawful. There was no need for the Munaf Court to consider an issue at the center of this dispute: whether notice is required to prevent an unlawful transfer. In considering the Munaf petitioners’ request to enjoin their transfers, the district court had the benefit of competing arguments from the petitioners and the government for each specific transfer. See 128 S.Ct. at 2226 (emphasizing that the government had considered and determined that the petitioners, Shaw-qi Ahmad Omar and Mohammad Munaf, would be treated adequately by Iraq’s Justice Ministry and the prison where they would be held); see also Omar v. Harvey, 416 F.Supp.2d 19, 28 (D.D.C.2006) (stating petitioner’s reasons for seeking an injunction barring transfer); Petition for Writ of Habeas Corpus at 7, Munaf v. Harvey, No. 06-1455 (D.D.C. Aug. 18, 2006) (same). Although the Supreme Court rightly gave substantial weight to the government’s determination that the proposed transfer was lawful, the petitioners were at least permitted to argue otherwise. The Kiyemba petitioners should be afforded the same opportunity.
Other factual and legal differences limit Munaf & applicability to our case. Critical to Munaf s holding was the need to protect Iraq’s right as a foreign sovereign to prosecute the petitioners. See 128 S.Ct. at 2221 (“[0]ur cases make clear that Iraq has a sovereign right to prosecute Omar and Munaf for crimes committed on its soil.”). No such interest is implicated here. The Court also emphasized Iraq’s status as an ally and the fact that the petitioners had voluntarily traveled to Iraq to commit crimes during ongoing hostilities. See id. at 2224-25. Again, nothing similar is involved in this case. Perhaps most important, the Munaf petitioners sought a unique type of relief, as the Court stressed:
[T]he nature of the relief sought by the habeas petitioners suggests that habeas is not appropriate in these cases. Habe-as is at its core a remedy for unlawful executive detention.... At the end of the day, what petitioners are really after is a court order requiring the United States to shelter them from the sovereign government seeking to have them answer for alleged crimes committed within that sovereign’s borders.
Id. at 2221. Given the significant differences between the circumstances of Munaf and this case, we are not required to hold that courts are foreclosed from exercising their habeas powers to enjoin a transfer without some opportunity for a detainee to challenge the government’s representation that his transfer will be lawful.
III.
In the end, I would add only one element to the process the majority concludes is sufficient for considering the petitioners’ transfer claims. But it is, I believe, a fundamental element called for by the Great Writ. The constitutional habeas protections extended to these petitioners by Boumediene will be greatly diminished, if not eliminated, without an opportunity to challenge the government’s assurances that their transfers will not result in continued detention on behalf of the United States. Accordingly, I respectfully dissent.

. Because this case should be governed by Boumediene s extension to the detainees of habeas protections that include the bar against unlawful transfer, I view the issues of interest to Judge Kavanaugh in his concurring opinion as inapposite. For example, whether the Due Process Clause of the Fifth Amendment reaches these detainees is simply not part of the inquiry required in this case. The critical issue is whether the petitioners’ habeas rights permit them to offer evidence that their proposed transfers will result in continued detention by a foreign nation on behalf of the United States.