UNITED STATES of America ex rel. Ronald James DESSUS, Appellant,

v.

COMMONWEALTH OF PENNSYLVANIA.

No. 19226.

United States Court of Appeals, Third Circuit.

Argued Sept. 23, 1971.

Decided Nov. 29, 1971.

**558**

Paul Bender, University of Pa. Law School, Philadelphia, Pa., for appellant.

James D. Crawford, Deputy Dist. Atty., Philadelphia, Pa., for appellee.

Before VAN DUSEN, ALDISERT and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This appeal from a denial of a writ of habeas corpus, 316 F.Supp. 411, raises many well-briefed constitutional questions, of which we find three to require extended discussion:

(1) whether this court has habeas corpus jurisdiction under 28 U.S.C. § 2254(b) where no custodial sentence has been imposed;

(2) whether introduction of evidence seized by police offended the fourth amendment;

(3) the extent of state court discretion, measured against the equal protection clause, to deny requests for appointment of "such specialists as justice of the case may require" as provided in the Pennsylvania statute governing assistance of counsel for indigents in state criminal proceedings. 19 Pa.Stat.Ann. § 784.

On April 3, 1966, during the early morning hours, Mrs. Lena Alexandroff, age 79, her daughter, Natalie Tuchar, 44, and her granddaughter, Paula Tuchar, 14, were brutally beaten and raped in their Philadelphia home. Immediately, police began to canvass the area for two Negro males, both approximately five feet ten inches tall, one wearing dark clothes and a light tan coat, and the other wearing dark clothes, a dark

coat, and a hat. Police had already picked up one suspect when they discovered appellant and another man walking along a deserted street about five blocks from the victims' home. Appellant wore a dark suit and carried a tan trench coat under his arm; his companion wore dark clothing and a dark coat. The officers drove alongside the two and asked them where they were coming from. One man "mumbled" an inaudible response. Testimony is conflicting as to whether the officers then ordered the two men into the car or merely instructed them to step nearer the vehicle. In any event, when one of the officers emerged from the car, appellant broke and ran. While fleeing, appellant dropped the tan coat and a radio which was stolen from the victims' home; he was quickly apprehended.

Appellant, his companion, and the other suspect immediately were taken to the hospital where the victims had been admitted. Police informed Mrs. Alexandroff and her daughter, who was being treated in the same room, that they had picked up some suspects, and that they would bring the men into the room for identification. The suspects were shown singly to Natalie Tuchar and then to Mrs. Alexandroff. Mrs. Alexandroff identified appellant and his companion but did not identify the third man. Father Vladimir Borichevsky, an acquaintance of the victim, was present and testified to this identification at the trial because Mrs. Alexandroff died nineteen days after the crime as a result of injuries sustained in the attack.

Appellant was convicted on nine of ten separate indictments emanating from these events. Custodial sentences were imposed on four, including a life sentence for the murder of Mrs. Alexandroff. Sentence was suspended on the remaining five indictments upon which appellant was convicted, including that for the rape of Mrs. Alexandroff.[1]

Appellant's habeas corpus petition extends to his convictions under all of these indictments except one: he has not presented a petition challenging the conviction of murder. Appellant argues: (1) that the testimony of Father Borichevsky concerning Mrs. Alexandroff's identification denied appellant his sixth amendment right to confront witnesses against him; (2) that the police did not have probable cause to arrest him, and, therefore, that any evidence obtained as a result of the search incident to the arrest was inadmissible; and (3) that he was denied due process and equal protection of the laws by the trial court's failure to provide him with funds to employ a psychologist to examine him and to testify at the trial.

Because the *sine qua non* of federal habeas corpus jurisdiction is that

---

1. Appellant's convictions and sentences were under the following indictments:

| No. 283 | rape of Natalie Tuchar | 10–20 years |
| 284 | rape of Mrs. Alexandroff | Sentence Suspended |
| 285 | rape of Paula Tuchar | 10–20 years, consec. to 283 |
| 286 | burglary | 10–20 years, consec. to 285 |
| 287 | conspiracy | Sentence Suspended |
| 288 | (acquittal) | |
| 289 | assault with intent to murder | Sentence Suspended |
| 290 | murder of Mrs. Alexandroff | Life Imprisonment |
| 292 | aggravated robbery | Sentence Suspended |
| 293 | aggravated robbery | Sentence Suspended |

The proceedings are reported in detail in the opinion of the Superior Court of Pennsylvania which affirmed judgments of conviction on direct appeal. Commonwealth v. Dessus, 214 Pa.Super. 347, 257 A.2d 867 (1969); Petition for Allocatur to Pennsylvania Supreme Court was denied in 1969.

petitioner be "in custody,"[2] we have concluded that the procedural posture of this petition prevents our consideration of appellant's contention that Father Borichevsky's testimony concerning Mrs. Alexandroff's identification of appellant denied him his rights under the confrontation clause.[3] The challenged testimony related a statement of Mrs. Alexandroff that appellant raped her. Thus, because appellant's murder conviction is not under review, this testimony was relevant only to the conviction for the rape of Mrs. Alexandroff. Although appellant was found guilty of this crime, he was given a suspended sentence.[4] Without a custodial sentence, appellant was not "in custody" under that indictment within the meaning of 28 U.S.C. § 2254; thus, he may not seek federal habeas corpus relief therefrom.

 The sole justification of federal habeas jurisdiction for a state prisoner is the statutory mandate that the applicant be a "person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254. Indeed, in the seminal case of Fay v. Noia, 372 U.S. 391, 83 S. Ct. 822, 9 L.Ed.2d 837 (1963), Mr. Justice Brennan was careful to emphasize: "The jurisdictional prerequisite is not the judgment of a state court but detention *simpliciter*." 372 U.S. at 430, 83 S.Ct. at 844.[5] Thus, custody is the passport to federal habeas corpus jurisdiction. Without custody, there is no detention. Without detention, or the possibility thereof, there is no federal habeas jurisdiction.[6]

Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), and Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), compel no contrary conclusion. In those cases petitioners applied for habeas corpus relief while incarcerated under or paroled from custodial sentences. Similarly, in Peyton v. Rowe, 391 U.S. 54, 88 S.Ct.

2. 28 U.S.C. § 2241. See also 28 U.S.C. § 2254(b) :

> An application for a writ of habeas corpus *in behalf of a person in custody pursuant to the judgment of a State court* shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner. (Emphasis added)

3. The state court approved the admission of Father Borichevsky's testimony of Mrs. Alexandroff's statement as a *res gestae* exception to the hearsay rule. Commonwealth v. Dessus, *supra*, 257 A.2d at 872.

4. Pennsylvania distinguishes probation and parole from a suspended sentence. Where one is enlarged on liberty in the former situations, a violation of probation or parole conditions may subject the probationer or parolee to reincarceration. Where an indefinite suspended sentence is pronounced, however, the trial judge may not thereafter vacate the suspension and impose sentence, unless within the same term of court. See United States ex rel. Kent v. Maroney, 435 F.2d 1020, 1023–1024, n. 4 (3d Cir. 1970).

5. Federal habeas corpus is not a review by a lower federal court of a state judgment, because neither the constitution nor the statutory basis of such jurisdiction nor the dictates of comity between the state and federal judicial systems permit such review :

> [A] state court judgment is [not] required to confer federal habeas jurisdiction. * * * Habeas lies to enforce the right of personal liberty; when that right is denied and a person *confined*, the federal court has the power to release him. Indeed, it has no other power; it cannot revise the state court judgment; it can act only on the body of the petitioner. In re Medley, Petitioner, 134 U.S. 160, 173 [10 S.Ct. 384, 388, 33 L.Ed. 835].

372 U.S. at 430–431, 83 S.Ct. at 844. (Emphasis added.) *Fay* held that although the Supreme Court will review a judgment of the highest court of a state, assuming there is no adequate and independent state' ground on which the judgment rests, this privilege is not conferred on lower federal courts. See Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) ; Hill, "The Inadequate State Ground," 65 Colum.L.Rev. 943 (1965).

6. See "Developments in the Law : Federal Habeas Corpus," 83 Harv.L.Rev. 1038, 1072–1093 (1970).

1549, 20 L.Ed.2d 426 (1968), a prisoner serving one of consecutive or successive sentences imposed by the same sovereign was held to be "in custody" for federal habeas purposes to challenge his detention under any of the other sentences. But custodial sentences were imposed for the convictions challenged in *Peyton* as in all the subsequent cases which have expanded the *Peyton* rule.[7] The expansion of the "in custody" jurisdictional concept has been in recognition that remaining "disabilities and burdens" which emanate from one conviction confer upon petitioners a "substantial stake in the judgment" sufficient to challenge that conviction even without present incarceration based thereon. *Carafas, supra,* 391 U.S. at 237, 88 S.Ct. 1556. No such stake appears here; petitioner is not in custody for one conviction which may have emanated from the testimony he seeks reviewed, and he has claimed no error in the other. A ruling in petitioner's favor could afford him no direct relief from his present detention, nor indirectly in terms of his ultimate release date. *Cf.* Thacker v. Peyton, 419 F.2d 1377, 1379 (4th Cir.1969).

Like the Fifth Circuit in Westberry v. Keith, 434 F.2d 623 (5th Cir.1970), "[w]e can find no decision by the Supreme Court nor by this circuit which would allow federal courts to take habeas corpus jurisdiction under § 2254 when the petitioner has applied for the writ after suffering [no custodial sentence]." 434 F.2d at 624–625. See also, United States ex rel. Myers v. Smith, 444 F.2d 75, 77 (2d Cir.1971). We hold, therefore, that this court is without jurisdiction to review a petition for habeas corpus where petitioner was given a non-custodial sentence. Accordingly, the confrontation issue raised by the appellant to contest his conviction for the rape of Mrs. Alexandroff is not appropriate for federal inquiry.

■ Appellant next claims that the police exceeded constitutional boundaries because they subjected him to arrest without probable cause, and that the discarded coat and radio, along with other items seized from his person, were inadmissible as fruits of that illegal arrest. Davis v. Mississippi, 394 U.S. 721, 89 S. Ct. 1394, 22 L.Ed.2d 676 (1969). The admissibility of these items indeed depends upon the validity of appellant's arrest. This turns upon "whether, at the moment the arrest was made, the officers had probable cause to make it— whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. United States, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

We have noted that there was some confusion as to precisely when the arrest occurred.[8] If police did not attempt the

---

7. Dodd v. U. S. Marshal, 439 F.2d 774 (2d Cir. 1971); United States ex rel. Meadows v. New York, 426 F.2d 1176, 1179 (2d Cir. 1970); Word v. North Carolina, 406 F.2d 352 (4th Cir. 1969); George v. Nelson, 410 F.2d 1179 (9th Cir. 1969). *Cf.*, United States ex rel. Van Scoten v. Pennsylvania, 404 F.2d 767 (3d Cir. 1968).

8. On direct examination, Officer Scheld testified that appellant broke and ran after being instructed to get into the police car:

Q. What did you do when you saw these two persons walking toward, as you say, 49th Street?

A. Well, I mentioned to my partner that they were there. As we turned east on Woodland, we pulled over towards the curb, and my partner called them over to the car.

Q. What did he say?

A. I believe he asked them where they were coming from. They more or less mumbled something and we asked them to get into the car.

At this, I opened the door on the recorder's side and started to get out. My partner had come out from the driver's side to the rear of the car. One man proceeded to get into the car, and at this, the man furthest away from me broke.

arrest until after appellant fled, the arrest was clearly lawful. Such "flight at the approach of strangers or law officers [is a] strong indici[um] of *mens rea*," and a proper factor to be considered in the decision to make an arrest. Sibron v. New York, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968). Moreover, we find that if appellant's arrest occurred prior to his flight, it would still have been constitutionally permissible. The police were searching for two Negro males, both approximately five feet ten inches tall, one wearing dark clothes and a light tan coat, and the other wearing dark clothes, a dark coat, and a hat. The search was conducted at 4:30 a.m., only a few minutes after the commission of the crime, in a racially-mixed neighborhood. During this time, the police found only three individuals fitting this description.[9] On the basis of these facts, we conclude that the officers were in possession of sufficient information to give them probable cause to make the arrest. Chambers v. Maroney, 399 U.S. 42, 46–47, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Horton, 142 U.S.App.D.C. 225, 440 F.2d 253, 254 (D.C.Cir.1971). Because the arrest was lawful, any items discarded by or seized from appellant incident to that arrest were admissible into evidence. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); United States ex rel. Foose v. Rundle, 389 F.2d 54, 55 (3d Cir.1968).

■ Finally, we address ourselves to appellant's contention that the trial court's denial of his motion for funds to employ a psychologist contravened the due process and equal protection clauses. Appellant's principal defense at trial was insanity. Prior to trial, appellant moved the court, pursuant to 19 Pa.Stat.Ann. § 784,[10] to allocate funds with which to

During cross-examination, however, Officer Scheld testified that appellant fled from the scene before he was told to get into the car:

A. We called them over to the car. I opened the car door.

\* \* \* \* \*

I opened the car door to get out, to ask them to get in. But I did not get [a] chance to ask them to get in, because the one man broke.

On direct examination, Officer Lewis, the other arresting officer, stated that appellant ran before being told to get into the car.

Q. Did you approach them in your car?

A. Yes, we did.

Q. How did you approach them? Or, tell us how you used your automobile as you came up there.

A. Why, I drove in, sort of in towards the curb, and pulled in, you know, to the back of them. And at this time I was telling my partner, you know, to get out of the car, we would stop them, you know, for possible identification and their reason as to why they were there.

Q. And tell us what you did then?

A. Well, as we swung in and I beckoned to the men and indicated that I would like to speak with them for a moment, the man on the inside, who was at that time carrying something under his arm, he broke and ran.

9. This is so even in light of the fact that one of the officers testified that he would have picked up any black man he saw that morning. We point this out, not because we condone this "dragnet" approach, but merely to accent the fact that there were very few people afoot that morning in the vicinity of the crime.

10. Whenever any person, charged with murder, shall make and file with the clerk of the court of quarter sessions an affidavit, setting forth that he or she is wholly destitute of means to employ counsel and prepare for his or her defense, the judge \* \* \* shall assign to such person counsel, not exceeding two, to represent and defend such person. Such appointed counsel may petition the court \* \* \* to secure a rule to show cause why the court should not permit a special investigator or investigators to assist them in the preparation of the case, or such specialists as justice of the case may require for the proper defense of their clients, and following a hearing at which time such court appointed counsel shall sustain their request by evidence satisfactory to the court, the court shall grant such special investigator or investigators or

hire a psychiatrist and a psychologist. The court granted funds to hire a psychiatrist, but denied the request for funds to employ a psychologist.

Dr. Nelson, the psychiatrist employed by appellant, diagnosed appellant as a psychopathic delinquent suffering from organic brain damage, unable to deliberate prior to activity and, therefore, incapable of understanding the nature or quality of his actions. Dr. Nelson stated that he was firm in this diagnosis and that he required no further information. He testified that he based his opinion on psychological tests performed on appellant in 1952, 1955, 1959, and 1960, and that more recent tests would produce no substantial change in his diagnosis because there would be no significant differences in tests administered after the subject reached the age of six. Dr. Kool, the psychiatrist for the Commonwealth, agreed that appellant had a psychopathic personality, but he found no organic brain impairment, and concluded that appellant was sane. Appellant contends that because Dr. Kool used as a basis for his diagnosis a psychological test administered prior to trial by a psychologist employed by the state, the denial of appellant's motion for funds to employ a psychologist to make a similar test denied appellant equal protection of the laws.

We reject the notion that the introduction by the government of a psychologist-expert's testimony necessarily requires commensurate countervailing testimony for the defense. For "[o]ur concern for expert opinion to serve as a check on other expert opinion depicts a striving to assist the Court in resolving complex and elusive issues presented in proceedings of this kind, but our holdings do not mean the process is to go on *ad infinitum.*" Proctor v. Harris, 134 U.S.App.D.C. 109, 413 F.2d 383, 387 (1969). Here, as in *Proctor,* there is implicit in the assignment of error the notion that such expert witnesses are adversaries. But as Chief Justice (then Circuit Judge) Burger there noted, "the fact remains that psychiatrists are physicians, not advocates." *Proctor, supra,* 413 F.2d at 387. Moreover, "we see no basis for assuming that one court-designated expert needs the surveillances of another psychiatrist who is thrust into what would be essentially a partisan role." *Id.* See also McGarty v. O'Brien, 188 F.2d 151 (1st Cir.), cert. denied, 341 U.S. 928, 71 S.Ct. 794, 95 L.Ed. 1359 (1951). Like the district court,[11] we find no obligation, constitutional or statutory, to provide appellant with a court-appointed psychologist to supplement the findings of the court-appointed psychiatrist who testified at appellant's behest.

We find that the trial court's denial of appellant's motion for funds to employ a psychologist did not deny appellant due process or equal protection of the laws. Whether to allocate such funds is a decision within the trial judge's discretion, Commonwealth v. Phelan, 427 Pa. 265, 234 A.2d 540 (1967), cert. denied, 391 U.S. 920, 88 S. Ct. 1803, 20 L.Ed.2d 657 (1968).[12] We find no abuse of that discretion. Moreover, even if we were to find error in the trial judge's refusal to allocate these funds, in light of Dr. Nelson's testimony that additional psychological testing would be superfluous, the error would be

expert witness or witnesses * * *. Section 784 was repealed "absolutely as to all counties except the County of Philadelphia" by the Public Defender Act of 1968, 16 Pa.Stat.Ann. Sec. 9960.11(1).

11. United States ex rel. Dessus v. Pennsylvania, 316 F.Supp. 411, 418 (E.D.Pa. 1970).

12. Phelan subsequently sought and was denied habeas corpus relief in federal court. United States ex rel. Phelan v. Brierley, 312 F.Supp. 350 (E.D.Pa.1970). In his majority opinion affirming that denial *en banc,* Judge Adams acknowledged that the allocation of funds for the appointment of a medical expert is expressly addressed to the discretion of the trial court, and found no abuse of that discretion in such a denial to Phelan. United States ex rel. Phelan v. Brierley, 453 F.2d 73, pp. 81, 82 (3d Cir., filed October 26, 1971).

harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

We have examined all of appellant's additional assignments of error and find them uniformly lacking in merit.

The order of the district court denying habeas corpus relief will be affirmed.